## Case No. 367.

### ANDRAE et al. v. REDFIELD.

[12 Blatchf. 407.][1]

Circuit Court, N. D. New York. Jan. 19, 1875.[2]

CUSTOMS DUTIES — ACTION TO RECOVER PAYMENT — LIMITATIONS — ESTOPPEL — INJUNCTION.

1. The plaintiffs in this bill had claims to be repaid the excess of duties, paid by them under protest, to the defendant, while collector of the port of New York, upon imported goods. The statute of limitations was about to take effect, and the plaintiffs contemplated bringing suit. An officer in the custom house at New York stated to the attorney for the plaintiffs, that, according to the practice, the presentation of their claims to a designated officer at the custom house prevented the running of the statute of limitations, and that, if they should be so presented, and suits should thereafter be brought, the statute could not be and would not be interposed as a defence. The defendant, who, at the time, had gone out of office, disclaimed any control in the matter, but declared his confidence in the experience and knowledge of such officer, and expressed to the attorney his concurrence in such statement and opinion. The plaintiffs presented their claims, and refrained from bringing suits until after the statute had run against all of the claims, relying upon the recognition by the government of claims of the like nature, and upon what was so said by such officer and by the defendant. The plaintiffs afterwards brought suits at law against the defendant, to recover such excess of duties, and the defendant pleaded such statute. More than seven years after the pleas were interposed, the plaintiffs filed this bill in equity, praying for an injunction to restrain the defendant from insisting upon the statute as a defence. The defendant demurred to the bill, for want of equity: Held, that the bill must be dismissed.

2. The power of a court of equity cannot be invoked to enjoin a defendant from setting up the statute of limitations, on the ground that the cause of action sued on was originally good and valid.

3. The lapse of time before the bill was filed, after the pleas were interposed, commented on, as a ground for withholding relief, even if the plaintiffs might otherwise be entitled to it.

4. Regarding the actions at law as suits against the government, it cannot be prejudiced by any opinion or promise made or expressed by the defendant, especially when, at the time he said what he said, he was no longer in office. [See note at end of case.]

5. Regarding such actions as suits against the defendant, he cannot be prejudiced by anything said or done by the government or its officials, without his concurrence, especially after he ceased to be collector. [Cited in Hennequin v. Barney, 24 Fed. 582.] [See Crooke v. Maxwell, Case No. 3,413.] [See note at end of case.]

6. Such actions are properly to be regarded as suits against the defendant, in fact as well as in form.

7. Such conclusion is not affected by the fact that, as a condition of obtaining an injunction herein, pendente lite, the plaintiffs stipulated that, in any event, certificates of probable cause should be granted in such actions, to the end that no execution should issue against the property of the defendant.

8. The officer in the custom house had no authority to bind the government by an agreement not to plead the statute of limitations; and, on what is set forth in the bill, he did not profess to make any such agreement.

9. The defendant made no such agreement, but only expressed an opinion; and, if what he said could be viewed as an agreement, it was without mutuality and without consideration.

10. According to the statute of limitations of New York, (Code Proc. § 110,) "no acknowledgment or promise shall be sufficient evidence of a * * * continuing contract, whereby to take the case out of the operation of" the statute, "unless the same be contained in some writing signed by the party to be charged thereby," and the highest court of that state has decided, that a parol agreement not to plead the statute cannot operate as a new promise, or as a waiver of the statute, or as an estoppel in pais.

11. The facts stated create no estoppel as against the government, or as against the defendant.

12. Decisions of the court granting or refusing a preliminary injunction are not conclusive, either upon the court or the parties, in a subsequent disposition of the cause by a decree.

[In equity. Bill by Otto Andrae and Bernhard Andrae, trading as Andrae & Co., and others, against Constance C. Redfield, executrix, and Frank B. Redfield, executor, of Heman J. Redfield, deceased, to enjoin the plea of the statute of limitations in certain suits pending at law. Heard on demurrer to the bill. Bill dismissed. Plaintiffs afterwards appealed to the supreme court, and the decree was affirmed. Andreae v. Redfield, 98 U. S. 225.]

Almon W. Griswold, for plaintiffs.
Webster & Craig, for defendant.

Before WOODRUFF, Circuit Judge, and WALLACE, District Judge.

WOODRUFF, Circuit Judge. The bill of complaint herein is filed by the several plaintiffs in sixty separate actions at law, each brought to recover from the defendant an alleged excess of duty, illegally exacted by the defendant while collector of the port of New York. The payment of the various amounts exacted in excess of duty is alleged to have been made under protest, by the respective plaintiffs in the actions at law, at various dates in the years 1853, 1854, 1855, 1856 and 1857. It is not stated in the bill on what precise day the said several sixty actions at law were commenced, but it is inferrible, from what is stated, that they were commenced in May, 1864, about seven years after the defendant went out of office, as such collector, which was July 1st, 1857. In November, 1866, he pleaded, in those actions, among other defences, the statute of limitations. To the replications to those pleas demurrers were interposed, but issue was finally joined in April, 1872, and the cases were in apparent readiness for trial

---

[1][Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2][Affirmed by supreme court in 98 U. S. 225.]

for several terms, but were postponed from term to term. In March, 1874, this bill was filed, the several plaintiffs in those actions at law uniting herein as complainants. The defendant has filed a general demurrer. The only relief sought by the bill is an injunction, to restrain the defendant "from prosecuting or maintaining, upon the trial of any of the said sixty suits, his plea of the statute of limitations, and from claiming or insisting, on said trials, upon any defence thereunder, and from, in any way or manner, claiming or pretending, in said sixty actions, or any of them, that the statute of limitations is a bar thereto."

The alleged excess of duty consists of two items or particulars: 1st. That, in ascertaining the dutiable value of the goods imported, the defendant erroneously included the expense of transportation from the principal market in the country from which they were imported, to the place of shipment; 2d. That he also erroneously included in such dutiable value a higher rate of commissions than the usual or customary rate for purchases made at the places from which the importations were made.

The bill is liable to some criticism for want of clearness, certainty and definiteness in many particulars; and it introduces many matters which occurred after the defendant ceased to be collector, to which he was not a party, which, even if they tend to show that the duties were illegally assessed, as matter of law, ought not, in any manner, otherwise to prejudice the defendant, nor to affect his right to defend the said actions by any legal defence. It may be gathered from the bill, that the facts relied on as grounds for the injunction are, that, at some time, the bill does not state when, though its language may, perhaps, warrant the inference that it was prior to February 1st, 1856, the circuit court of the United States for the southern district of New York and the circuit court of the United States for the district of California, in suits, in like cases, brought by other importers, decided that similar exactions were illegal; that the amounts of the exactions in those cases were refunded by the secretary of the treasury; that, on the 1st of February, 1856, the secretary of the treasury published a general regulation. declaring that freight or transportation from the foreign port of shipment to the port of importation, or from the place of production or manufacture to another port, for shipment or transhipment to the United States, is not a dutiable charge; that, on the 4th of October, 1856, the secretary of the treasury addressed a letter to this defendant, in these words: "Sir—On application being made to you by Messrs. A. Iselin & Co. and others, of New York, you are authorized and directed to cause to be prepared the usual certified statements for return of 'duty on freight,' in such cases where the same has been found to have been paid in excess, as decided by

this department in general regulations, No. 63, p. 22, and under written protest, and transmit same to this department, for its consideration;" and that, on the 27th of. May, 1857, the secretary of the treasury addressed another letter to the defendant, in the following terms: "Sir—I am in receipt of your letter of the 26th inst., transmitting a report of the U. S. appraisers in relation to the 'usual commissions' charged in China, Sweden, Norway, Holland and German ports, and have to state, in reply, that you will cause to be prepared and transmitted to this department the usual certified statements of return of the duty exacted in error, in all cases where it is found that the said duty has been on a rate of commission greater than the usual rate chargeable in the above named countries." It is not averred, in the bill, that any of the goods imported by the complainants in this suit were imported from either of the countries named in this letter, nor are the terms of general regulation No. 63 stated, so as to show specifically that the claims of these complainants in the several actions at law were embraced within the said letter of the previous 4th of October. These facts are, however, assumed as at least recognizing the principle claimed by the complainants, and the bill avers, that these letters determined and established the complainants' right to the return of the excess of moneys "so paid by them severally for duties," though it is not alleged that these letters were communicated to them by the secretary of the treasury, as a guide to their conduct in bringing suits, or otherwise, or were written or intended for the purpose of influencing them in that matter. If, however, it were conceded that the rights of the complainants to have returned to them the moneys so paid, or the moneys for which they ultimately brought their said several actions, were thereby determined and established, it is not very obvious that these letters constituted an excuse to the plaintiffs for not bringing suit within six years after their causes of action accrued, which should deprive the defendant of his defence, unless it be on the ground that a court of equity should, in all cases, enjoin a defendant from setting up the statute of limitations as a bar, if it appear clear that the cause of action was originally good and valid, as to which the observations of the court, touching the purpose and policy of statutes of limitations as statutes of repose, in Levy v. Stewart, 11 Wall. [78 U. S.] 249; U. S. v. Wiley, Id. 513; and Leffingwell v. Warren, 2 Black, [67 U. S.] 599,—are of some significance. The power of a court of equity cannot be invoked to annul statutes of limitation on any such ground.

The bill then avers, that the complainants furnished to the auditor of the New York custom house statements of particulars, to enable him to prepare the certified state-

ments called for by the aforesaid instructions of the secretary of the treasury, and that, before November 1st, 1859, all the particulars of their claims were furnished to such auditor. The occurrences which—if it be. conceded that the plaintiffs had, prior thereto, valid causes of action—alone bear on the question, whether the complainants give such reasons as should move a court of equity to exercise the extraordinary power of enjoining the defendant from availing himself of his legal defence to suits brought against him, are, in substance, as alleged in the bill, the following: That, in the summer of 1859, the plaintiff's attorney suggested to such auditor, Mr. S. G. Ogden, (a subordinate in the New York custom house,) that the statute of limitations would apply to said claims, and the period of limitation of six years would expire, in some of the cases, on the 1st of November, 1859, and, in the residue of the cases, before July, 1863, and that he supposed it might be necessary to commence suits before November. 1st, 1859, on all the claims, to prevent the statute from becoming a bar; that, to this, the said auditor replied, imputing it to the fault of the then collector, Mr. Schell, that the money was not refunded, stating, that the instructions given to such then collector, in May, 1858, (which included, in substance, the above letter of October 4th, 1856,) were peremptory, and further stating, that "all the plaintiffs had to do, to prevent the statute of limitations from running, was to present their claims, in each case, to the refunding clerk in the auditor's office, for adjustment, upon which presentation, by the rules and practice of the treasury department, the statute ceased to run," also, that, "if all the plaintiffs should commence suits for the recovery of these debts which the secretary had already ordered to be refunded, it would justify the department in the belief that it was done for the purpose of accumulating bills of costs, and must necessarily annoy the department, and unfavorably prejudice the department against the plaintiffs and their claims, and that it was not necessary to commence suits to prevent the statute from running, but only to present the claims;" that, afterwards, in or about September, 1859, the said attorney conversed with the defendant herein, (who had ceased to be collector,) and stated to him what the said auditor, Mr. Ogden, had said, to which the defendant replied, that he had no longer any control over the adjustment of these claims, and, as far as he was concerned, Auditor Ogden had the whole charge of the matter, who must be, from his long experience, familiar with the practice of the department, and the attorney could rely upon the accuracy of Mr. Ogden's statements; that, shortly thereafter, at a meeting of the said attorney and said Ogden and the defendant, said Ogden stated to the defendant, as he had before to the attorney, that, ac-

cording to the practice of the department, if the plaintiffs had already presented their claims for refunding, or if they would do so, the statute ceased to run from the date of such presentation, as effectually as if suit was commenced; and he corroborated his assertions by referring the defendant to decisions of the department to that effect, and, at the same time, expressed his belief that Collector Schell would yet be persuaded to resume the adjustment; and that the defendant thereupon said, he saw no necessity for suing on these cases, and, if the plaintiffs had presented or would present their claims for adjustment, the statute ceased to run from that time, and could not and would not be interposed as a defence to the payment of them, and he concurred with Mr. Ogden in the expressed opinion, that Collector Schell would soon resume the adjustment of them, and added, that, of course, these claims would all be paid. The bill also avers, that, relying on the matters aforesaid, and for the purpose of avoiding a multiplicity of suits, the plaintiffs refrained from bringing action immediately, in full faith and confidence that the statute of limitations would not be set up as a defence, in case suits should be brought on said claims at any time afterwards. As already suggested, there are other matters stated in the bill, to which the defendant was not a party, which tend to show that the government officers regarded claims of the nature of those alleged to be embraced in those sixty actions as valid, and constituting grounds for refunding whatever excess appeared, upon investigation, to have been paid. But it does not appear that these claims of the complainants were ever adjusted, and their specific nature, or the amounts thereof, ever ascertained, so as to be submitted to the treasury department in a form which, under the instructions referred to in the bill, would enable the secretary of the treasury to consider them, pass upon their legality or their amount, or give any order to pay them.

The case made by the bill may be, briefly, but, we think, completely, for all the purposes of the demurrer, stated as follows, assuming, of course, the facts alleged: The complainants had just and legal claims to be repaid the excess of duties, paid by them under protest, upon certain goods imported, and the defendant was liable to them therefor. The statutes of limitation were about to take effect, as a bar to an action for such excess, and the plaintiffs contemplated bringing suits. An officer in the New York custom house stated to the plaintiff's attorney, that, by the rules and practice of the treasury department, the presentation of their claims to the auditor, or to the refunding clerk at the custom house, prevented the running of the statute of limitations, and, if so presented, and suit was thereafter brought, that statute could not be, and would not be, interposed as a defence. The

defendant, disclaiming any control in the matter, but declaring his confidence in the experience and knowledge of such officer, expressed to the plaintiffs' attorney his concurrence in the statement and opinion thus given. The plaintiffs did present their claims, and, in reliance upon the recognition by the secretary of the treasury of claims of the like nature, and upon the statements and opinion of such officer, and the concurrence of the defendant therein, refrained from bringing suit until after the statute had run against all of the claims. Suits having been then brought, and the defendant having interposed the statute of limitations as a bar, the complainants, seven years and upwards after these pleas of the statute of limitations were filed, apply to this court, as a court of equity, to restrain the defendant from insisting upon the statute as a defence.

If it were true that the interposition of this defence by the defendant was inequitable, in such sense that it created a cause of action in equity, the lapse of time since the pleas were interposed, exceeding another limitation of six years, furnishes the plausible suggestion, at least, that the complainants, at so late a day, and after keeping the defendant so long in the court of law, are entitled to slight favor. Courts of equity expect of applicants for the exercise of extraordinary jurisdiction, that they apply promptly, so soon as occasion arises. If this lapse of seven years since these pleas were filed be not held a bar to the complainants' prayer for what they deem equitable relief, it creates doubt whether, at so late a day, this court ought to interfere in their behalf. But, without resting any conclusion upon this view of the complainants' position in the controversy, we have deemed it proper to examine the bill, to see what, divested of much of obscurity, indefiniteness and want of precision, it can fairly, and as a matter of substance, be said to present, as an appeal to a court of equity to exercise the extraordinary power of interference with the defendant's clear legal right.

The case obviously suggests the inquiry—are the sixty actions at law to be regarded, for the purposes of this suit, as actions against the United States, or as actions against the defendant therein? The counsel for the plaintiffs insist, as we understand them, that they should be deemed actions against the United States; and yet the bill of complaint, by its allegations, would seem to be designed to deal with the case, on some points, as if the defendant were defendant in fact and in law, as well as in form, and, on other points, as if the United States was the real defendant, and as if the formal defendant was only defendant in form and has no real interest therein.

1. If the actions are to be treated as if they were actions against the government, then how can the government be prejudiced by any opinion, representation or constructive promise made or expressed by the defendant, and, especially, by any opinion, representation or constructive promise made or expressed after he ceased to be an officer of the government? We are of opinion, that, if such be the view we ought to take of those actions at law, the government cannot be so prejudiced. While the complainants are insisting that, for all purposes in a court of equity, those actions are against the government, in which the nominal defendant has no interest, still his opinion and alleged representations, long after the causes of action arose, and long after he ceased to be an officer of the government, are made, in the bill of complaint, prominent ground of that reliance which, as they aver, led them to refrain from bringing their actions. If it be true, that, for the purposes of this suit, the defendant has no interest in those actions, then he has, or should have, no control of those actions, then he could not do or say anything which would affect, or which should be permitted to affect, the rights of the government. It would necessarily follow, that all that is averred in the bill touching his assurances or representations, must be disregarded as irrelevant or immaterial. Thereupon, the complainants' case in this court would stand, and their claim to an injunction would rest, on these facts, viz.—the secretary of the treasury had recognized the validity of all claims of the like nature, and the complainants were assured by an auditor in the New York custom house, that the practice of the treasury department was, not to plead the statute of limitations in such cases, and that the statute did not run after the claims were presented to him or to a clerk in his office, and could not, and would not, be interposed, and, in reliance upon this, the complainants omitted to sue until the period of limitation had expired. On the question whether, in this aspect of the case, any just ground for an injunction can be found, some observations will be made in the further discussion which follows. In disposing of the demurrer to certain replications in the actions at law, the opinion was expressed, that the statute which, under certain circumstances, makes it the duty of the secretary of the treasury to pay the judgments, if any should be recovered against the defendant, had not barred him of any legal defence to the actions brought against him. We are inclined still to the opinion, that nothing in that statute was intended to operate to place the defendant at a disadvantage in a court of equity, and enable the government officers, by their acts, after the cause of action had accrued against him, to deprive him of his defence or defences. In that view, we suggest, that, although the counsel for the complainants repudiate that view of his relation to the suits, and claim that the actions should be treated as actions

against the United States, it is proper to consider the case in its other aspect.

2. If, then, the actions at law are to be dealt with as, in law and in fact, as well as in form, actions against the defendant, then, clearly, the defendant is not to be prejudiced by anything whatever said or done by the government or its officials, (without his concurrence,) after he collected the money for which he is sued, and, especially, after he ceased to be collector, which was long before these actions were brought against him; nor can anything so said or done create any equity in favor of the complainants, as against him. In this aspect of his relation to the actions at law, he may defend himself and his property by any lawful means; and can a court of equity properly restrain him, except upon the ground that he, himself, has said or done something which deprives him of his defence? Certainly not, and, if not, then this case and the prayer of the complainants for an injunction stand upon the mere conversation alleged to have been had with him in September, 1859, in which he expressed his concurrence in the opinion and statements of Mr. Ogden, the auditor of the New York custom house.

It is proper to add, in support of the view that the actions at law in question are, in fact as well as in form, actions against the defendant, that, if judgments be recovered therein, they become liens upon his real estate, and although, by a provision in the 12th section of the act of congress of March 3d, 1863, (12 Stat. 741,) which is now found in section 989 of the Revised Statutes, it may, upon certain conditions, become the duty of the secretary of the treasury to pay the judgments, it cannot be now asserted, in advance of the trial, that such duty will become absolute. Suppose that such payment should not, in fact, be made, can it be said that the defendant has no interest in the question of recovery or no recovery against him; and, especially, suppose that the court before which the trial may be had should not deem the case, as developed on the trial, one in which a certificate of probable cause ought to be granted, how, then, is the defendant to avoid the payment, protect his property from an execution, or relieve his estate from the lien of the judgment? We are not advised that there is anything in the Revised Statutes of the United States which makes these actions any less actions against the defendant; and sections 3009 to 3014 do not seem to us to change the nature of these actions, or deprive the defendant of any defence which he would otherwise be entitled to interpose.

When these actions were brought against this defendant, he was not a government officer. He is not sued as such officer, in any such sense that the suit proceeds against his successor in office. He must abide the result, and must pay the judgments, if judgments be recovered against him, unless, first, the conditions be fulfilled hereafter, upon which he may obtain indemnity from the government, and unless, also, it shall become the duty of the secretary to pay the judgments and that duty shall be performed.

We are informed, that, on a motion for an injunction herein, pendente lite, the plaintiffs were required, as a condition of granting the motion, to stipulate that, whatever facts might be developed on the trial, a certificate of probable cause might be granted, to the end that no execution might issue against the property of the defendant. If this could otherwise affect our determination, no such fact is before us on this demurrer to the bill of complaint. But, we ought not to pass by the argument founded thereon, without observing, that the plaintiffs cannot change the essential nature of their actions against the defendant, by any such stipulation made by themselves; and, second, which we conceive to be of greater and more obvious importance, that it would be a fraud upon the government to permit parties, by stipulation, to cast upon the government officers the duty to pay a judgment recovered against an individual. Whether a certificate of probable cause ought or ought not to be granted, is for the determination of the judicial tribunal, upon the facts developed on the trial; and the interests of the government, and the duty of the government to pay, are not left to the determination or choice of the plaintiffs in the actions. If it should be held, that the question, whether the government shall be required to pay the judgments may be decided by the plaintiffs therein, the government would be exposed to abuses and to collusion. This view might be illustrated by various supposable cases, but it seems too obvious to require it.

Viewing the actions at law as actions against the defendant, further suggestions are pertinent to the question, whether he can be prejudiced or affected by the acts of the government or its officials. The defendant had retired from the office of collector. He was a private citizen. He is sued by the complainants, to recover money which they allege he, when collector, exacted from them illegally. Now, it may be conceded that all legitimate sources of information may be resorted to by the court, to assist in the inquiry, whether, upon facts which may be proved, the collections which he made were or were not, when made, illegal. But it is, we think, equally clear, that neither the government officers, nor any authority of the government, can create a liability, either at law or in equity, which he did not incur; and we deny that either a subordinate in the New York custom house, or even the secretary of the treasury himself, could deprive the defendant of his right to defend by any defence valid and legal for his protection.

3. To any suggestion that the actions at

law may be regarded as of a mixed nature—in some possible contingencies, against the defendant, in other contingencies, as practically against the government—it must suffice to say, that this avails nothing in answer to the suggestions already made. In so far as the actions are to be treated as against the defendant, he is entitled to complete protection. He cannot be prejudiced by the acts, representations, or opinions of government officials, and, unless, by something said or done by himself, he has lost his legal defences, he must be permitted to urge them, and have judgment thereon in his favor, if the defences be valid; and this terminates the suits. On the other hand, in so far as these actions can be regarded (if at all) as actions against the government, it is true, as suggested in a previous point, that the acts, representations, or opinions of this defendant, after he ceased to be an officer of the government, cannot, either at law or in equity, prejudice the United States.

4. In any aspect of the case, what is the substance of the claim of the plaintiffs to a decree, and on what does such claim rest? On the argument of the demurrer to the plaintiffs' replications, (whereon an opinion was delivered, not reported,) it was claimed that there was an agreement not to plead the statute of limitations, made either by the defendant, or by the government officers, or by both. Several criticisms are pertinent to any such suggestion. The auditor of the New York custom house had no authority whatever to bind the government by any such agreement; and he did not profess to do so. He only assumed to state the rules and practice of the treasury department of the United States, to give an opinion upon the legal effect of the presentation of the complainants' claims to the auditor or refunding clerk, and to express the belief that the statute of limitations would not, after that, be urged as a defence to a suit or suits. This sufficiently, we think, disposes of any idea of contract by the government not to permit the statute to be pleaded, if it were conceded that any such contract could affect the defendant.

As to any idea of an agreement by the defendant, in the nature of a contract with the complainants—the conversation with the defendant, alleged in the bill of complaint, was so obviously the mere expression of an opinion as to what the department of the treasury and the then collector would do towards the adjustment and payment of the claims, and a concurrence in the opinions of the auditor, that it cannot import any undertaking on the part of the defendant whatever. Besides, viewed as a contract, it had in it no element of mutuality. There was no consideration therefor. The complainants did not agree not to sue, or to forbear for any period, short or long. On the contrary, they had the power, and the unimpeded right, to sue immediately. How,

then, was the running of the statute hindered? They did sue as soon as they deemed it for their interest. In this view, and, indeed, in every possible view of the subject, the inquiry is pertinent—how long after this conversation, upon the complainants' theory, might they delay? for ten years, or for twenty, and still claim that the statute could not be pleaded as a defence?

Again, the courts of the United States recognize and give effect to the statutes of limitation of the states in which those courts exercise their jurisdiction. This is well settled. See some cases collected in the opinion in Re Cornwall, [Case No. 3,250.] The cause of action here in question arose in the state of New York. The defendant was then, and when these suits were brought, a resident of the state of New York. This court exercises its jurisdiction within the state of New York, and, in the construction of the statutes of the state, and in declaring their effect, has respect to the decisions of the state courts. The statute of limitations of that state, from the protection of which the complainants desire to exclude the defendant, declares, (Code Proc. § 110,) that "no acknowledgment or promise shall be sufficient evidence of a * * * continuing contract, whereby to take the case out of the operation of" the statute "unless the same be contained in some writing, signed by the party to be charged thereby." And the court of last resort in that state, in Shapley v. Abbott, 42 N. Y. 443, hold, that a parol agreement not to plead the statute cannot operate as an acknowledgment of the debt, nor as a new promise, nor as a waiver of the statute; and, finally, that, although relied upon very much, as it is alleged the complainants relied upon the circumstances stated in this bill, it does not operate as an estoppel in pais, to preclude the defence. Shall this court, as a court of equity, say, that a parol agreement not to plead the statute will take a case out of the operation of the statute, when a parol promise to pay would not? Especially, shall they say so of, at the utmost, a mere declaration of opinion, or even of intention, not to plead the statute, founded on no consideration, and involving no mutuality of agreement? To do so would completely defeat the design of the statute to protect parties against perjury, by requiring that no promise shall have such effect, if not in writing and signed, &c. In this connection, it may be proper to bear in mind, that no actual fraud is alleged or claimed, in this bill, to have been practiced upon these complainants.

5. This brings us to the argument forcibly urged upon our attention, which was, however, considered in Shapley v. Abbott, above referred to—that the defendant is estopped to insist upon the statute as a defence. This claim requires, as already suggested, that it be first determined who is, for the purposes of this suit, to be deemed the real defendant.

in the actions at law. If it be the government, as the complainants now insist, then the statements and representations of the defendant, after he ceased to be collector, should be laid out of view. What facts have the government stated or represented, so as to create an estoppel? Statutes, rules and regulations of the treasury department, if they show that the complainants once had a legal claim, if the facts be as stated in the bill, go no further. These do not affect the validity of the defence of the statute of limitations, either at law or in equity, if the complainants do not prosecute their once legal claim within the time limited. Can a subordinate officer in the custom house make representations, either touching the past or the future, which can estop the government in a case like the present? He is not appointed or authorized for any such purpose or with any such power. What he said or did was not in the receipt of money paid to him, or which he was authorized to receive, or in respect of which he was executing a general authority, such as enables agents, sometimes, to bind their principal by contemporaneous acts or declarations. The money was in the treasury of the United States. He had no power or authority to bind the government, by prescribing the terms or conditions upon which it should be refunded to the complainants.

But, what is it alleged that he represented? Nothing of substance, except, that, by the rules and practice of the department of the treasury, the presentation of the claim put an end to the running of the statute of limitations, and such statute could not and would not, thereafter, be set up as a bar. If that statement was an opinion, that, as matter of law, the presentation of the claims prevented the running of the statute, then, of course, it estopped no one. As a statement of a fact, it had no effect as an estoppel. It may, for the purposes of the question, be deemed the statement of the truth. Suppose that the rules and practice were as stated. Could not the department of the treasury change them at pleasure? The argument would make such a practice, once begun, forever binding and unchangeable, for, the moment an attempt was made to depart from it by setting up the statute of limitations as a defence, a court of equity would be called upon, as here, to enjoin the defence. All else that was said by the auditor was prospective. It had reference to the future conduct of a defence to a suit or suits which might thereafter be brought. If full authority to make the statement on behalf of the government were conceded, it was, at most, promissory. This is not of the nature of an estoppel in pais. In truth, it was but the expression of opinion, either of the law, or of what the treasury department would do in the future. Such an opinion is no estoppel. But, the want of authority in this official, already adverted to, is sufficiently conclusive, apart from these last mentioned distinctions.

If, on the other hand, we again treat the defendant as, for the purposes of this suit, the real party in interest, then the considerations arising out of the terms of the New York statute apply, and the decision of the New York court of appeals is pertinent; and, besides this, his conversation is subject to like observations as are above made on the conversation of the auditor. Fairly interpreted, all that the defendant is alleged to have said to the complainants' attorney had reference to the future conduct of the government or the secretary of the treasury in the matter, and was a concurrence in the views of Mr. Ogden, accompanied with an express disavowal or protest that he, the defendant, had any control in the adjustment and refunding which the attorney was urging. How, in the face of that protest, and of his express reference to the judgment and experience of Mr. Ogden, for information as to what the government would do, could the complainants rely upon anything said by him as binding any one in any form? It is, however, unnecessary to pursue the discussion in that aspect, since the complainants, on the argument of the demurrer, insist, that we should regard the government, and not the nominal defendant, as the real party, and, if so, the acts or declarations of the defendant, after he ceased to be an officer of the government, cannot estop the latter. We add, however, that we are unable to find in either aspect of the case any sufficient ground for declaring that either are estopped to make any legal defense to these actions at law which may be available. There are many other views bearing upon the sufficiency of this bill, which have been adverted to on the argument, in support of the demurrer, but we deem it unnecessary to pursue further a discussion already greatly protracted.

It is easy to group all the circumstances detailed in this bill of complaint, and assuming that the claims of the complainants were originally just and legal, say that the complainants ought not to be vexed and hindered by such a defence; that the government ought to have refunded their money; that the complainants did wait in reliance upon the circumstances detailed in the bill; that, although they may have been unwise in so long delaying to sue, they did not suppose that their rights would be prejudiced thereby; that, even now, the government ought to refund the money; and that, unless there is some suspicion of unfairness or fraud, some loss of evidence bearing upon the justice of their claims, or the amount thereof, or reason to believe that delay in bringing suit has wrought some prejudice or endangered some right, or there is danger in establishing a precedent, or some reason other than appears on the mere face of this bill, then the interposition of such a defence, by or at the

instance of the government, enabling it to retain money wrongfully gotten into the treasury, and against importers who would seem to have been long and patiently doing what they could, short of suing, to obtain their rights, is ungracious, and invites an effort to avoid. the effect of the statute, if possible. But we have not been able to find grounds upon which, on principles of law or equity, a court of equity can interfere.

It is suggested, that, as an injunction pendente lite was granted in this court, and upon this bill, we ought to deem the question res adjudicata, or ought, at least, to follow such allowance of the injunction as an authority. This would have saved us much time and labor; it would have been a throwing off of responsibility, quite grateful to us, if we had deemed it consistent with the proper discharge of duty. But, the granting of a preliminary injunction has for its precise object the retaining of all things in their then condition until the case can be deliberately heard or examined upon the issues finally made for hearing or trial. It is provisional merely. It is granted as matter of discretion. It is often and properly granted where the question is important and doubtful. When the case comes to be finally heard on the merits, and judgment is to be pronounced, the court are bound to apply to it the rules that govern the rights of the parties; and there is nothing provisional in such judgment. They then finally settle those rights. Until that can or should be done, a temporary injunction is often a discreet exercise of the power of the court, to see that nothing is done pendente lite which will impede the doing of what may be finally adjudged to be right, in the matter in controversy. But for this preliminary injunction, the defendant might have pressed the actions at law to trial and judgment, before this case could be heard and decided, so as to become the subject of further review, if the parties so desired. Decisions of the court granting or refusing a preliminary injunction are not conclusive either upon the court or the parties, and are not intended to be so, in a subsequent disposition of the cause by a decree. We are, therefore, not wanting in due respect to the court or the judge by whom the preliminary injunction was granted. On the contrary, our convictions tend to the belief, that, if sitting with us on the hearing of this demurrer, his conclusion must be the same as our own deliberate judgment.

The demurrer must be sustained, and the usual decree dismissing the bill, with costs, be entered, unless the complainants wish to amend. In that case, leave should be given, on the usual terms.

[NOTE. In affirming this decree, Mr. Justice Clifford, speaking for the supreme court, said: "Conceding that the United States is the real party, still the court is of opinion that there is nothing in the remarks attributed to the auditor of the customhouse, or to the refund clerk, or to the secretary of the treasury which can be held to preclude the respondent from pleading any proper plea to the actions which he may think necessary in making his defense. * * * Congress, undoubtedly, might authorize actions of the kind to be brought directly against the United States; but all must concede that such a power has never ·been exercised and is not conferred, and, in the absence of such· legislation, the court is of the opinion that such actions may in certain aspects be treated as actions against the collector, unless it appears that he acted under the directions of the proper official authority, or that a case is made where no execution can issue against the collector. * * * Taken in the most favorable view for the complainants, it is clear that it is impossible to regard the remarks attributed to the secretary of the treasury or to the officers of the customs as a contract or promise made by either party. There was no promise to forbear instituting the suits; nor was there any promise, if forbearance was accorded, that the statute should cease to run. * * * When they separated, each party was as free to pursue his own course, as when the interview commenced. Complainants might have brought suits the same day, and, if they had, the respondent would have been at liberty to make any defense in his power, irrespective of anything which had transpired at the interview." Justices Miller and Field dissenting. Andreae v. Redfield, 98 U. S. 225.]